IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. _____

| | |
|---|---|
| Primo Products, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Electrotemp Technologies China, Inc., | ) |
| | ) |
| Defendant. | ) |

**NOTICE OF REMOVAL**
**(From Mecklenburg County,**
**11 CVS 19186)**

Pursuant to 28 U.S.C. §§ 1441 and 1446 and 28 U.S.C. § 1331, Defendant Electrotemp Technologies China, Inc. ("Defendant" or "Electrotemp"), by and through its undersigned counsel, hereby files this Notice of Removal of this case from the General Court of Justice, Superior Court Division, Mecklenburg County, North Carolina ("Superior Court"), to the United States District Court for the Western District of North Carolina. In support of this Notice, Defendant states the following:

1.     Plaintiff Primo Products, LLC ("Primo" or "Plaintiff"), filed this action against Defendant in the General Court of Justice, Superior Court Division, Mecklenburg County, North Carolina, on October 14, 2011. Copies of the Summons issued by the Superior Court and the Complaint filed by Plaintiff are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

2.     On January 19, 2012, Defendant received copies, via process server, of the Summons and Complaint for the first time.  Other than Plaintiff's Civil Summons and Complaint, no proceedings have been had in this matter.

3.     This Notice of Removal is timely under 28 U.S.C. § 1446(b).  The case became removable upon receipt of Plaintiff's Summons and Complaint because there is complete diversity between the parties and the amount in controversy stated on the face of the Complaint exceeds $75,000.

4.     As alleged in paragraph 2 of the Complaint, "Primo is a limited liability company organized under the laws of the State of North Carolina.  Primo conducts business in and maintains places of business in Mecklenburg County, North Carolina."

5.     As alleged in paragraph 3 of the Complaint, "Electrotemp is a corporation organized under the laws of [Ontario] Canada."  Electrotemp's principal place of business is in Ningbo City, Zhejiang, China, with an office in Ontario, Canada, as well.

6.     The Complaint alleges claims for breach of contract, quantum meruit, and products liability.

7.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the requisite diversity of citizenship exists, as the Plaintiff is a North Carolina limited liability company with its principal place of business in North Carolina, and Defendant is a corporation organized under the laws of Ontario, Canada, with its principal place of business in Ningbo City, Zhejiang, China, as well as an office in Ontario, Canada.

555845

**8.**     The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  Plaintiff alleges in paragraph 16 of its Complaint:  "Electrotemp owes Primo $2,160,867 in credits as of August 31, 2011 . . . .  Primo estimates an additional $464,000 in future returns for product that had not been sold."  Plaintiff further alleges in paragraph 17 of its Complaint:   "In addition, Primo incurred $241,452 in costs of returning the defective merchandise to ETI China . . . ."

**9.**     The Court, therefore, has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in as much as there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**10.**     All pleadings from the state court action have been attached to this Notice of Removal, as required by 28 U.S.C. §§ 1441 and 1446.

**11.**     This Notice of Removal is being served upon counsel for Plaintiff and filed with the Clerk of Court for the General Court of Justice, Superior Court Division, Mecklenburg County, North Carolina.  Copies of the Notice of Filing of the Notice of Removal, together with this Notice of Removal, are being served upon Plaintiff's counsel pursuant to 28 U.S.C. § 1446.

**12.**     Accordingly, all procedural requirements for removal have been satisfied.

WHEREFORE, Defendant Electrotemp Technologies China, Inc., hereby removes this action, from the General Court of Justice, Superior Court Division, Mecklenburg County, North Carolina, to the United States District Court for the Western District of North Carolina.

Respectfully submitted this the 17th day of February, 2012.

/s/ Edward B. Davis
EDWARD B. DAVIS, N.C. State Bar No. 27546
Email: ward.davis@belldavispitt.com
Bell, Davis & Pitt, P.A.
227 West Trade Street, Suite 2160
Charlotte, North Carolina 28202
Telephone:    704/227-0400
Facsimile:    704/227-0178
**ATTORNEY FOR DEFENDANT**

4

555845

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have served a copy of same upon plaintiff's counsel by depositing said copy in a first class postage prepaid wrapper in a post office or official depository under the exclusive care and custody of the United States Postal Service, properly addressed to:

        Kiran H. Mehta, Esq.
        Email: kiran.mehta@klgates.com
        Molly L. McIntosh, Esq.
        Email: molly.mcintosh@klgates.com
        K&L Gates LLP
        Hearst Tower, 47th Floor
        214 North Tryon Street
        Charlotte, North Carolina 28202
        Telephone:   704/331-7437
        Facsimile:   704/353-3137


                                /s/ Edward B. Davis
                                EDWARD B. DAVIS
                                N.C. State Bar No. 27546
                                Attorney for Defendant

5

555845

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have served a copy of same upon plaintiff's counsel by depositing said copy in a first class postage prepaid wrapper in a post office or official depository under the exclusive care and custody of the United States Postal Service, properly addressed to:

Kiran H. Mehta, Esq.
Email: kiran.mehta@klgates.com
Molly L. McIntosh, Esq.
Email: molly.mcintosh@klgates.com
K&L Gates LLP
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina 28202
Telephone:    704/331-7437
Facsimile:    704/353-3137


/s/ Edward B. Davis
EDWARD B. DAVIS
N.C. State Bar No. 27546
Attorney for Defendant

555845

# **Exhibit A**

# STATE OF NORTH CAROLINA

File No.
11-CVS- 19186

MECKLENBURG County

In The General Court Of Justice
☐ District ☒ Superior Court Division

Name Of Plaintiff
PRIMO PRODUCTS, LLC,

Address

City, State, Zip

## VERSUS

Name Of Defendant(s)
ELECTROTEMP TECHNOLOGIES CHINA, INC.

### CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3, 4

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

## To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Electrotemp Technologies China, Inc. | |
| c/o George M. Yui | |
| 260 Scarlett Road, Apt. 201 | |
| Toronto, Ontario M6N 4X6, Canada | |

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff) | Date Issued | Time | ☐ AM ☒ PM |
|---|---|---|---|
| Molly L. McIntosh | 10-14-2011 | 3:38 | |
| K&L Gates LLP | Signature | | |
| Hearst Tower, 47th Floor, 214 North Tryon Street | | | |
| Charlotte                          NC  28202 | ☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time | ☐ AM ☐ PM |
|---|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Signature | | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | | |

NOTE TO PARTIES: *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (Type Or Print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts

**Exhibit B**

STATE OF NORTH CAROLINA ~~FILED~~    IN THE GENERAL COURT OF JUSTICE
                                     SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG                11-CVS- 19186

PRIMO PRODUCTS, LLC,

                    Plaintiff,       )
                                     )
            vs.                      )
                                     )          COMPLAINT
ELECTROTEMP TECHNOLOGIES             )
CHINA INC.,                          )
                                     )
                    Defendant.       )
                                     )

        Plaintiff Primo Products, LLC ("Plaintiff" or "Primo"), by and through its undersigned

attorneys, for its Complaint against Defendant Electrotemp Technologies China Inc.

("Defendant" or "Electrotemp") hereby alleges and says:

## NATURE OF THE CASE

        1.      This case arises from a long term commercial relationship between Primo and

Electrotemp pursuant to which Electrotemp sold water coolers and related equipment to Primo.

In connection with that relationship, the parties also entered into an agreement dated as of March

4, 2010 (the "Agreement"), a true and accurate copy of which is attached hereto as Exhibit A and

incorporated herein by reference. Electrotemp's breach of the Agreement, as detailed herein, has

prompted the commencement of this suit.

## PARTIES AND JURISDICTION

        2.      Primo is a limited liability company organized under the laws of the State of

North Carolina. Primo conducts business in and maintains places of business in Mecklenburg

County, North Carolina.

3. Electrotemp is a corporation organized under the laws of Canada. Electrotemp does business in and is engaged in substantial activity in North Carolina. Electrotemp water coolers are sold in this State and, in particular, in Mecklenburg County. Pursuant to the Agreement, Electrotemp shipped goods, including water coolers and related equipment into North Carolina, for which Primo, which is based in North Carolina, paid.

## FACTUAL ALLEGATIONS

4. Primo markets and supplies water coolers and related products to retailers in North America for sale to end user consumers.

5. Electrotemp manufactures water coolers and related products.

6. In 2007, Electrotemp began manufacturing water coolers for Primo (the "Electrotemp Water Coolers" or the "Coolers").

7. From 2008 to present, Primo sold the Electrotemp Water Coolers under the Primo brand to retailers, including, without limitation, Sam's Club, Costco, Target, Wal-Mart, Kmart, Lowes Home Improvement and others. These retailers in turn sold the Primo-brand Electrotemp Water Coolers to end user customers.

8. Primo received a number of claims from retailers to cover defective Electrotemp Water Coolers that had been returned to the retail stores by unsatisfied customers.

9. The reasons that the Electrotemp Water Coolers had been returned to the retail stores include, without limitation, that the Coolers leaked, the Coolers caused the water contained inside and dispensed there from to taste bad, and the Coolers did not keep the water contained inside cool.

- 2 -

10.     When retailers returned defective Electrotemp Water Coolers to Primo, Primo would credit the retailer for the defective product and would return the defective Electrotemp Water Coolers to Electrotemp's plant in China ("ETI China").

11.     Primo and Electrotemp entered into the Agreement in part to address concerns related to returns of Electrotemp Water Coolers.

12.     The Agreement contains a procedure for returns of defective Electrotemp Water Coolers, including returns already made as well as subsequent returns.

13.     Section 2(12) of the Agreement provides that, "Electrotemp agrees that for all coolers returned to ETI China, That [sic] the coolers will be credited by Electrotemp to Primo at the same cost as Primo is charged by its Retailers including any 5% to 8% handling fees charged by Retailers for such returns."

14.     Section 2(13) of the Agreement provides as follows: "Electrotemp agrees that this amount will be refunded to Primo through mutually agreed discounts of 18% against future purchase orders starting in 2010 until any shortfall in 2009 defectives is recaptured and re-paid with an estimated settlement date of July 2010. Furthermore, Electrotemp agrees that until such time the defectives are recaptured that the discounts will remain at 25% minimum consisting of 18% discount plus monthly handling charges estimated at 5-8%. All Subsequent returns from retailers will be treated in the same way. And as such, Electrotemp is responsible for potential returns on these products as they are returned."

15.     Pursuant to Section 2(15), "Electrotemp agrees that the costs incurred by Primo for returns including warehousing, handling, shipping will be summarized on a monthly basis and invoiced to Electrotemp."

- 3 -

16. Electrotemp owes Primo $2,160,867 in credits as of August 31, 2011, as a result of defective merchandise returned to ETI China pursuant to Sections 2(12) and 2(13). Primo estimates an additional $464,000 in future returns for product that had not been sold.

17. In addition, Primo incurred $241,452 in costs of returning the defective merchandise to ETI China, including, without limitation, shipping charges, in reliance on Electrotemp's express promise to promptly reimburse such costs.

18. Electrotemp has not paid outstanding invoices in the amount $241,452 in costs of returns incurred by Primo in breach of Section 2(15) of the Agreement and its subsequent agreement to reimburse said costs.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

19. Paragraphs 1 through 18 are realleged and incorporated by reference.

20. The Agreement is a valid and enforceable contract between Primo and Electrotemp.

21. Primo has fulfilled all conditions and obligations under the Agreement.

22. Electrotemp has breached the Agreement by acts and omissions which include, without limitation, the failure to credit Primo $2,160,867 as of August 31, 2011 as a result of defective Electrotemp Water Coolers returned by Primo to ETI China and the failure to pay Primo $241,452 in cost of returns of defective merchandise.

23. As a direct and proximate result of the breach of the Agreement by Electrotemp, Primo has suffered damages which include, without limitation, expenses incurred in reasonable reliance on mutual performance under the Agreement.

- 4 -

24.     Accordingly, Primo is entitled to a judgment against Electrotemp in an amount in excess of $10,000 to be determined at trial, in addition to all interest, costs, and attorneys' fees allowed by law.

## SECOND CLAIM FOR RELIEF
### (In the Alternative to Breach of Contract – Quantum Meruit / Implied Contract / Unjust Enrichment)

25.     Paragraphs 1 through 24 are realleged and incorporated by reference.

26.     In the event that it is determined that Electrotemp is not contractually obligated to pay Primo the $2,160,867 credit (but rather owes Primo credit on future purchase orders in this or a lesser amount), then Electrotemp would be enriched at Primo's expense if it were allow to retain the returned merchandise without paying for it.

27.     Primo did not return the defective merchandise to Electrotemp gratuitously.  In exchange for return of the merchandise, Primo expected to be reimbursed for the credits it paid to retailers for the defective Electrotemp Water Coolers.

28.     The defective Electrotemp Water Coolers returned by Primo to ETI China were knowingly accepted by Electrotemp.

29.     The acceptance of the defective Electrotemp Water Coolers by Electrotemp created an implied contract, and Electrotemp are obligated to pay the reasonable value of such returned Coolers.

30.     In the event that Electrotemp does not pay Primo for the returned Coolers, Electrotemp will be unjustly enriched in an amount greater than $10,000 at the expense of Primo.

31.     In the alternative to its breach of contract claim, Primo is entitled to a judgment against Electrotemp by implied contract, for unjust enrichment or in quantum meruit in a sum greater than $10,000.

- 5 -

## THIRD CLAIM FOR RELIEF
### (Violation of Products Liability Act, N.C. Gen. Stat. § 99B-1, *et seq.* / Breach of Implied Warranty of Merchantability)

32.    The allegations of paragraphs 1 through 31 above are realleged and incorporated herein by reference.

33.    Electrotemp is a merchant of the Electrotemp Water Coolers supplied to Primo.

34.    Pursuant to North Carolina law, including, without limitation, N.C. Gen. Stat. § 25-2-314, Electrotemp impliedly warranted to Primo that the Electrotemp Water Coolers were merchantable, free of material defects and fit for their intended use.

35.    The Electrotemp Water Coolers that Primo returned to ETI China were not merchantable for reasons that include, without limitation, the following:

(a)    Among other things, these Coolers leaked, caused water contained inside to taste bad, and/or did not keep the water contained inside cool, and therefore, are not fit for the ordinary purposes for which they are used; and

(b)    These products contain manufacturing defects, and thus would not pass without objection in the trade under the contract description, and are not of fair average quality within the description.

36.    Electrotemp has breached the implied warranty of merchantability and thereby violated the Products Liability Act, N.C. Gen. Stat. § 99B-1, *et seq.*

37.    Primo has suffered damages as a result of Electrotemp's breach of the implied warranty of merchantability, including, without limitation, the cost to reimburse retailers for the defective Electrotemp Water Coolers and the cost to return the defective Electrotemp Water Coolers to ETI China.

- 6 -

38. Upon information and belief, as a result of Electrotemp's breach of the implied warranty of merchantability, Primo has been damaged in an amount in excess of $10,000 to be proven at trial, in addition to all interest, costs and attorneys' fees allowed by law.

WHEREFORE, Plaintiff Primo prays:

1. For a judgment in favor of Primo for:

(a) Damages in excess of $10,000 from Electrotemp under Primo's First, Second, and Third Claims for Relief;

(b) All costs and expenses incurred in this action, including reasonable attorneys' fees;

3. All issues of fact arising out of this action be tried by a jury; and

4. The Court grant Primo such other and further relief as the Court shall deem just and proper.

This the 14th day of October, 2011.

*Molly L McIntosh*

Kiran H. Mehta
N.C. State Bar No. 11011
Molly L. McIntosh
N.C. State Bar No. 36931
K&L Gates LLP
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202
Telephone: (704) 331-7437
Facsimile: (704) 353-3137
*Attorneys for Plaintiff Primo Products, LLC*


OF COUNSEL:

K&L GATES LLP
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202

- 7 -

THIS AGREEMENT made the 4th day of March, 2010 and effective as of the 4th of March, 2010

BETWEEN:

ELECTROTEMP TECHNOLOGIES CHINA INC., a corporation duly
incorporated pursuant to the laws of Canada
(hereinafter referred to as "Electrotemp")

- and -

PRIMO PRODUCTS, LLC, a corporation duly incorporated
under the laws of the State of Delaware United States of America
(hereinafter referred to as "Primo").

WHEREAS:

1. Electrotemp carries on, among other things, the manufacture of the goods specified in Schedule "A" (the "Products");

2. Primo markets and supplies water coolers and related products to the retailer market in North America for sale to end user consumers; and

3. Primo wishes to secure Electrotemp as an exclusive supplier of the Products, for the consideration and on and subject to the terms and conditions contained in this agreement.

NOW THEREFORE, in consideration of the mutual promises contained herein, for payment of $2.00, now paid by each party to the other (the receipt and sufficiency of which is hereby acknowledged), and in consideration of the mutual covenants, agreements, recitals, promises, and other considerations as set forth herein, and intending to be legally bound hereby, the parties hereby covenant and agree as follows:

1. Agreement to Buy and Sell/Term

   1)   Primo agrees to purchase the Products from Electrotemp and Electrotemp agrees to sell the Products to Primo for resale to end users on the terms and in the manner set forth in this agreement.

   (2)   This agreement shall be for an initial period of one year commencing as of the effective date written above and shall automatically renew in perpetuity on the 31st day of December, unless the agreement has been earlier terminated by a party in accordance with the provisions of this agreement.

EXHIBIT
A

## 2. Responsibilities of Electrotemp

So long as Primo is not in default of any of the terms of this agreement, Electrotemp agrees to the following:

(4) Electrotemp shall use its best efforts to produce and supply to Primo the Products forming part of this agreement on the terms and conditions contained herein and in the schedule(s).

(5) Electrotemp agrees that it will recognize Primo's exclusive distribution rights for the Products in U.S.A. (hereafter referred to as the " U.S.A. Retailers"). Primo agrees that Electrotemp shall be permitted during the term of this agreement and thereafter, (and it shall not be considered a breach of this agreement), to:

    a. sell the Products with Electrotemp's own brands to any other parties anywhere other than to the U.S.A. Retailers;

    b. sell the Products, with Electrotemp's own brands to any parties, including U.S.A. Retailers, where such Products will be retailed outside of the U.S.A.;

    c. sell returned and re-conditioned Products with Electrotemp's own brands, to any party, except for U.S.A. Retailers

    d. sell any Product with Electrotemp's own brands directly to the home and commercial end users.

(6) Electrotemp shall use its best commercial efforts to develop and produce samples from time to time in accordance with acceptable specifications prepared and delivered by Primo to Electrotemp, at the sole cost and expense of Primo;

(7) Electrotemp shall use its best commercial efforts to manufacture the Products in accordance with mutually agreed upon specifications provided by Primo using the moulds and dies paid for by Primo;

(8) Electrotemp shall use best commercial efforts to secure applicable product and factory certifications, required by Primo, at Primo's expense, that may be required for the manufacture and retail sale of the Products. Electrotemp agrees that any cost of certification that results from failure on their part that require re-test will be the sole expense of Electrotemp.

(9) Electrotemp agrees to use its best commercial efforts to maintain and run the factory in accordance with US retailer standards and obtain such certification as required.

- 2 -

(10)    Electrotemp shall use its best commercial efforts to source the tooling reasonably required for manufacture and supply of the Products being sold to Primo under the terms of this agreement and will be responsible for maintenance of all tooling, but Electrotemp is not responsible for the life-span of said tooling under reasonable use and normal wear and tear.

(11)    Electrotemp shall use its best commercial efforts to deliver orders for Product from Primo in accordance with the specifications of purchase orders from Retailers. Primo may assess reasonable fines, in the event it is accessed a penalty from a Retailer for late charges or products not shipped to terms of purchase order, if the event is mutually agreed to be a direct result of failure on Electrotemp

(12)    Electrotemp agrees that for all coolers returned to ETI China, That the coolers will be credited by Electrotemp to Primo at the same cost as Primo is charged by its Retailers including any 5% to 8% handling fees charged by Retailers for such returns.

(13)    Electrotemp agrees that this amount will be refunded to Primo through mutually agreed discounts of 18% against future purchase orders starting in 2009 until any shortfall in 2009 defectives is recaptured and re-paid with an estimated settlement date of July 2010. Furthermore, Electrotemp agrees that until such time the defectives are recaptured that the discounts will remain at 25% minimum consisting of 18% discount plus monthly handling charges estimated at 3%-8%. All Subsequent returns from retailers will be treated in the same way. And as such, Electrotemp is responsible for potential returns on these products as they are returned

(14)    Electrotemp shall use its best commercial efforts to provide Primo with any required replacement and spare parts for any approved warranty claims pertaining to any defective Products sold by Primo and manufactured by Electrotemp, at no charge. The validity of such warranty claims shall be determined by Electrotemp in its sole discretion. Shipments of such parts shall be in accordance with the reasonable instructions provided by Primo, subject to the availability of such parts. In the event that the agreement is terminated by either party, for any reason, Electrotemp agrees to provide parts until the end of the current contract year

(15)    Electrotemp agrees that costs incurred by Primo for returns including warehousing, handling, shipping will be summarized on a monthly basis and invoiced to Electrotemp

(16)    Electrotemp will be marking up and keeping 8% defective allowance until all deductions for defectives will be cancelled by 8% defective allowance

(17)    Electrotemp agrees to reimburse Primo for the useable tooling life costs left that were incurred and paid by Primo for the tooling and dies hereunder pursuant to section 3(I)(i). This reimbursement obligation arises only at that time when combined quantity of units, between Primo orders and coolers sold by Electrotemp reach 200,000 parts on

- 3 -

each tool and Primo has paid for all of the applicable tooling costs incurred and invoiced by Electrotemp. Primo understand that the tooling has a useful life of 200,000 parts per tool and that this tooling will be amortized over the life of production. Primo also understands that from time to time during life of production tools may need to be replaced at which time Electrotemp will advise Primo, and provide them with a cost for replacing and opening new tooling as needed.

### 3. Responsibilities of Primo

(1)    Primo agrees that for the duration of the agreement:

    a)  Electrotemp shall be the supplier to Primo of Products to be marketed and sold by Primo in the USA.

    b)  use its best commercial efforts to market and promote the sale of the Products and otherwise promote the placement of the Products (and make regular and sufficient contact for this purpose) with the Retailers in the USA.

    c)  it will not sell the Products directly to the home & commercial end users in the USA; with the exception of Primo's Regional Operators.

    d)  use its best commercial efforts to anticipate requirements for periods designated by Electrotemp and order promptly to provide for plant operations without major interruptions

    e)  it will use its best commercial efforts to promote all Products to all viable USA retailers, in order to secure market awareness and promotion of the Products.

    f)  it will use it best commercial efforts to provide on a timely basis, all required specifications, drawings, press-ready artwork and other information, documents or property that may be required for the manufacture and packaging of the Products or otherwise reasonably requested by Electrotemp; failing which Electrotemp shall not be responsible for any delays or failures in manufacturing or delivery of the Products to Primo;

    g)  it will use it best commercial efforts to promptly comply with all of the terms of sale for any of the Products, as herein set forth and promptly pay the sale price set by Electrotemp

    h)  will use it best commercial efforts to maintain adequate sales, warehouse and service facilities and sufficient stock of all the Products and repair parts to ensure prompt service to customers;

    i)  Will use it best commercial efforts to maintain customer service department to assist customers on issues related to products manufactured by Electrotemp at is

- 4 -

own cost. Furthermore, Primo agrees to share information obtained from customer service contacts with Electrotemp in order to make on-going improvements to units.

j) it will be responsible for payment of all freight and insurance, FOB, associated with the shipping of any and all Product, including any test and selling samples, ordered under the terms of this Agreement;

k) it will use its best commercial efforts to assist Electrotemp in assessing, securing and collecting any warranty claims and/or defective Products;

## 4. Responsibilities of Both Parties

Both Parties agree during the Term of this agreement:

a.) Primo, nor any of it affiliates will directly or indirectly manufacture, hold in inventory, or solicit orders for any Products which utilize, employ, or make use of the know-how, technology, and knowledge disclosed by Electrotemp, excluding Products or Warranty Parts purchased or obtained from Electrotemp needed to fulfill any and all open commitments required by Law or as set forth in this agreement.

b.) Electrotemp, nor any of it affiliates will directly or indirectly manufacture, hold in inventory, or solicit orders for any Products in the USA, excluding Products or Warranty Parts produced from Primo as needed to fulfill any and all open commitments required by Law or as set forth in this agreement.

## 5. Quotations

Primo shall Request For Quotations in Schedule "B" (the "RFQ"), from Electrotemp for all Primo's requirements of Products of sizes or styles listed in the schedule(s) hereto and amended from time to time for addition of new Products, such Products shall be specified in one or more supplementary schedule(s) at the prices and terms so quoted and shall be included in this agreement.

## 6. Prices

(1) Prices and any additional or supplementary terms and conditions of sale are as specified in the attached RFQ schedule(s).

## 7. Price Changes

- 5 -

All Pricing and terms for the Products are as specified in the RFQ are for the stated period with the exception;

(1)    Electrotemp may also from time to time with a (60) days' prior written notice to Primo Increase or Decrease the Product Price to Primo due to a 2% change in USD exchange rate from the quoted rate of 6.82 RMB to 1 USD. Electrotemp will provide backup document to support such increases, so that Primo has the ability to pass these increase onto our customers as required by acceptance of Purchases from such customers.

(2)    With (60) days' written notice to Primo, Electrotemp may from time to time increase any Product price by the amount of any new or increased duties, excise, sales or other like taxes imposed or levied during the term of this agreement by any governmental authority on the manufacture, sale, delivery or use of the materials used in the manufacture of the Products or which affect the cost of such materials. Electrotemp will provide backup document to support such increases, so that Primo has the ability to pass these increase onto our customers as required by acceptance of Purchases from such customers.

(3)    With (60) days' written notice to Primo, Electrotemp may increase or decrease any Product price by the amount of any increase in expense resulting from the use of substitute materials as agreed to by Primo.

(4)    With (60) days' written notice to Primo, Electrotemp may increase any Product price by the amount of any increase in expense resulting from government imposed cost of Labor. Electrotemp will provide backup document to support such increases, so that Primo has the ability to pass these increase onto our customers as required by acceptance of Purchases from such customers.

**8. Terms of Payment**

The terms and conditions of any sale by Electrotemp to Primo of any of the Products shall be by the means of Irrevocable LC , acceptable to Electrotemp's bank and issued at sufficient time to schedule and order components for the Products to be manufactured. If agreed by Electrotemp in writing, exclusions can be made to accept payments via bank transfer. The sale price and any applicable charges shall be paid by Primo promptly when due without any deduction, defalcation or set off unless mutually agreed to by both parties.

**9. Delivery Terms**

-6-

(1) **Forecasts.** Primo shall give Electrotemp a written quarterly forecast of Primo's requirements of Products stating the specifications needed, and shall place orders with Electrotemp sufficiently in advance of shipment dates to enable Electrotemp to obtain materials and complete the orders.

(2) **Government regulations.** When restricted by government regulations Electrotemp may fill Primo's orders at any time by delivering Products manufactured of substitute materials, provided that Electrotemp has given Primo notice of such substitution FIFTEEN (15) days prior to manufacture. Any of such substitutions to be approved for sale by Primo customers.

(3) **Shipping.** All deliveries of the Products shall be "F.C.A. Place of Shipment" from Electrotemp's Head Office or FOB Port Ningbo, based on PO & Quote Price . Risk of loss shall pass to Primo when the Products are put into the possession of the carrier, at which point Electrotemp shall be deemed to have completed good delivery to Primo. Deliveries under this section shall be made by means of a mutually agreed international carrier. Deliveries shall be deemed to have been made when the carrier has picked up the material for delivery from the shipper.

(4) **Shipping costs.** Primo shall be responsible for all duties, taxes, costs and procedures and compliance with all local laws, associated with importing all material shipped to Primo under this agreement into the country of destination.

(5) **Discrepancies.** Primo shall, not later than TEN (10) days following receipt of any of the Products, notify Electrotemp of any discrepancies in the packing list of such Products. If Primo shall fail to provide such notice to Electrotemp within this prescribed period, the Products shall be conclusively deemed to have been received by Primo without defects.

## 9. Termination

(1) If either party fails to perform any of its obligations under this or any other agreement, the other party, subject to the provisions of paragraphs 5(1)(p), 15 and 16, may terminate this agreement upon THIRTY (30) days' prior written notice. The notice shall become effective at the end of the THIRTY (30) day period unless the party in breach shall remedy the breach or other defect of performance during the THIRTY (30) day period. If Electrotemp continues to make shipments despite Primo's default, such action shall not constitute a waiver of the default or otherwise affect Electrotemp's rights and remedies under this agreement.

(2) Either party may terminate this agreement immediately if:

(a) bankruptcy or insolvency proceedings are instituted by or against the other party, or the other party is adjudicated a bankrupt, becomes insolvent, makes an assignment for the benefit of creditors or proposes or makes any arrangements for

-7-

the liquidation of its debts or a receiver or receiver and manager is appointed with respect to all or any part of the assets of the other party.

(b) a receiver or trustee of is being appointed over a party, provided such appointment is not vacated within Sixty days from the date of such appointment;

(3) On expiration or prior termination of this agreement for any reason, both parties agree that; Primo shall accept and pay for at contract prices all the Products previously ordered by Primo and which are either complete or in process and subsequently completed. Electrotemp shall honor and fulfill all orders for the Products received by Primo customers thru December 31, 2010 , or reimburse Primo for any and all losses or damages incurred on uncompleted orders for the Products or on materials for orders that are open and were to be fulfilled under this agreement. Upon, payment of any losses incurred for uncompleted orders and repayment of tooling paid for by Primo for the Products, Primo shall reconvey and release to Electrotemp all rights and privileges granted by this agreement on the Products, and Electrotemp shall retain all tooling, molds, and dies on the Products.

Furthermore, Electrotemp agrees that for a period of 12 months after date of expiration or termination, that it will not manufacture or solicit orders for shipment of the Products to USA Retailers. This subparagraph shall survive the termination of this agreement.

(5) Notwithstanding any such termination, all warranties set out in this agreement and all obligations of indemnification herein shall survive and continue to bind the parties for ONE (1) year after the date of termination.

(6) Electrotemp shall not, by reason of the termination of this agreement, be liable to Primo for compensation, reimbursement or damages on account of the loss of prospective profits on anticipated sales or on account of expenditures, investments, leases or commitments in connection with the business or goodwill of Primo or otherwise.

## 10. Warranties

(1) Subject as provided below, Electrotemp warrants all Products supplied by it to be free from defects in material and workmanship, but its sole liability under such warranty is to replace, free of charge, any part which, within the period specified below, is returned to Electrotemp or its authorized representative and which Electrotemp accepts as having been defective in material or workmanship. As an alternative to the replacement of the defective part, Electrotemp may elect to grant a monetary credit to Primo equal to the then current net delivered price to Primo of such part. The period mentioned above is to be calculated from the date when the product was delivered new to the retail purchaser and shall match the terms of the RFQ. In respect of any spare or replacement part (whether supplied by Electrotemp

-3-

following a sale or pursuant to a warranty claim), the greater of NINETY (90) days or the remainder of the period which is provided herein to be applicable to the product into which the part is incorporated.

(2)    Provided that:

(a) this warranty does not cover transportation, installation, labor or other costs except as provided above or as provided by Electrotemp's warranty claims procedure;

(b) all replaced parts become the property of Electrotemp; and

(c) this warranty does not apply to any Products from which Electrotemp considers in its discretion has been repaired, altered, neglected or used in any such way as to affect the Products adversely (reasonable wear and tear excepted) and without limiting the generality of the foregoing this warranty does not apply to any spare or replacement part used in any product for which it was not designed.

(3)    This warranty is given expressly in place of and excludes all other warranties and conditions expressed or implied, whether under common law, statute or otherwise, and there is expressly excluded every form of liability for loss or damage, direct or consequential, resulting from defective material, faulty workmanship or otherwise. Except as provided in this clause, Electrotemp makes no warranty, express or implied, with respect to the Products covered by this agreement. Claims for shortages must be presented in writing within TEN (10) days after receipt of shipment. All other claims must be presented in writing within ONE (1) month after receipt of shipment. Electrotemp shall not be liable under any circumstances for consequential, indirect or special damages or for damages resulting in any way from faulty closure or improper use of Products.

(4)    In the case of a product recall which is due to manufacturing deficiency, defect or other non-compliance by Electrotemp with any provision of this Agreement Electrotemp agrees to cover and reimburse Primo for 100% of the product cost

Electrotemp acknowledges and agrees that it shall be fully responsible for all Products previously sold or Manufacturer to Primo, whether such Products are currently held by Primo or a third party. Without limiting the foregoing, Electrotemp shall have full warranty responsibility for the manufacturing defects for all such Products to the same extent as set forth in Section 10 of this Agreement. In the case of manufacturing defect Electrotemp shall be responsible for all returns, demands, claims, complaints, actions or causes of action or suits with respect to such Products.

**11. Force Majeure**

-9-

Electrotemp shall be excused for failure to perform any part of this agreement due to events beyond its control. These events shall include but not be limited to fire, storm, flood, earthquake, explosion, accidents, enemy action, sabotage, strikes, labor disputes, labor shortages, work stoppages, electrical power outages, transportation embargos or delays.. When the events operating to excuse the performance by either Electrotemp or Primo cease, this agreement shall continue in full force for the remainder of its term provided that Electrotemp shall not be obliged to ship nor Primo to accept Products the shipment of which was excused. Notwithstanding, any obligation for payment by Primo to Electrotemp shall not be affected or delay under the provisions of this clause and such payment shall be strictly due in accordance with the terms of the payment.

### 12. Enurement and Relationship

(1) This agreement shall be binding upon Primo, its respective subsidiaries and associated and affiliated corporations and enure to the benefit of the successors and assigns of both parties, and all persons or corporations succeeding to or acquiring the business now carried on by Primo.

(2) The relationship between Primo and Electrotemp is intended to be and shall be that of Primo and Electrotemp only, and Either Company and its employees, agents and representatives shall under no circumstances be considered agents, partners, joint ventures, representatives or employees of the Other Company. Either Company shall not act or attempt to act, or represent itself, directly or by implication, as agent, joint venturer, partner, employee or representative of Other Company or in any manner assume or attempt to assume or create any obligations or liability of any kind, nature or sort, express or implied, on behalf of or in the name of the Other Company.

### 13. Governing Law

This agreement and any question concerning its validity, construction or performance shall be governed by the laws of Providence of Ontario, with jurisdiction in the Provincial Courts of Toronto, Canada.

### 14. Intellectual Property

(1) Primo agrees that it will not knowingly export, directly or indirectly, any technical information acquired from Electrotemp under this agreement or from the Products utilizing any such technical information, without obtaining Electrotemp's prior written approval.

(2) Nothing in this agreement shall be construed as transferring to Primo any right, title or interest in or to any patent or proprietary information, process or know-

- 10 -

how (the "Intellectual Property") in the Products and their various components, which is the property of Electrotemp or its affiliates.

(3) Electrotemp, on behalf of itself and its affiliates, shall retain all rights to all Intellectual Property relating to the Products In addition, Electrotemp shall be free to exercise all of its rights with respect to its Products and any patents under which such Products may be distributed; in agreement with Section 9 of this agreement.

(5) Primo acknowledges that it and its employees shall not, either during the term of this agreement or at any time thereafter, disclose any information which is of a proprietary and confidential nature and is a trade secret of Electrotemp. Primo shall take such steps as are necessary to ensure that it and its employees maintain the absolute confidentiality of all such information during the term of this agreement and at all times after the termination or expiration hereof shall not disclose same or permit to be disclosed, or use or permit it to be used, or otherwise obtain any benefit from all or any part of such information, except with the express written permission of Electrotemp. However, the foregoing shall not prevent disclosure by Primo of any information after it is available to the general public in a printed publication or of any information furnished to Primo by a third party who is not then in default of any obligation to Electrotemp regarding the confidentiality of such information.

(6) All Products shall remain the property of Electrotemp on termination or expiry of this agreement and shall not be copied and no information relating to the Product or special tooling shall be disclosed to any third party except for the purpose of this agreement, within the terms of Section 9 of this agreement.

15. Confidentiality
Both Parties acknowledge;

(1) that as a result of this agreement, the parties shall, or may, be making use of, acquiring or adding to information about certain matters and things which are confidential and which information is the exclusive property of the parties regardless of whether a patent or copyright has been issued on behalf of either party. (hereinafter referred to as "Protected Information"). Failure to mark any of the Protected Information as confidential, proprietary or Protected Information shall not affect its status as part of the Protected Information under the terms of this agreement. The parties agrees that they shall not, except with the prior written consent by both parties at any time during or following the original or any renewed term of this agreement, directly or indirectly, disclose, divulge, reveal, report, publish, transfer or use for any purpose any of the information which has been obtained or disclosed to them hereunder, including without limitation, any



- 11 -

Protected Information. Both parties shall take such steps as are necessary to ensure that it and its employees maintain the absolute confidentiality of all such information during the term of this agreement and at all times after the termination or expiration hereof shall not disclose same or permit to be disclosed, or use or permit it to be used, or otherwise obtain any benefit from all or any part of such information, except with the express written permission of the parties.

(2) The term "Protected Information" shall mean all of the following materials and information (whether or not reduced to writing and whether or not patentable or protectable by copyright) which Primo or Electrotemp receives, received access to, conceived or developed, in whole or part, directly or indirectly, prior to and in connection with this agreement with Electrotemp or in the course of Primo's prior and current relationship with Electrotemp (in any capacity) or through the use of any of Electrotemp's facilities:

  (a) production processes, marketing techniques and arrangements, mailing lists, purchasing information, pricing policies, quoting procedures, financial information, customer and prospect names and requirements, employee, customer, supplier and distributor data and other materials or information relating to Electrotemp's business and activities and the manner in which Electrotemp does business or produces the Products;

  (b) discoveries, concepts, and ideas including, without limitation, the nature and results of research and development activities, processes, formulas, inventions, technology, techniques, "know-how" designs, drawings and specifications;

  (c) any other materials or information related to the business or activities of Electrotemp which are not generally known to others engaged in similar businesses or activities; and

  (d) all ideas which are derived from or related to Primo's access to or knowledge of any of the above enumerated materials and information.

(3) Primo specifically acknowledges and agrees that it/they has/have no interest whatsoever in any intellectual property of the Products, in respect of the Protected Information, including without limitation any interest in know-how, patents, or Electrotemp trade names with the exclusion of packaging, marketing material, trademarks or trade names that Primo has created. Primo agrees that Electrotemp alone shall have the exclusive right to apply for, prosecute and obtain any and all patents, or any other intellectual property in respect of the Protected Information in any and all countries of the world. Primo hereby agrees, both during the term of this agreement and thereafter, to execute and demand any such applications,

-12-

transfers, assignments and other documents which Electrotemp may deem necessary or desirable for the purpose of vesting in, or assigning to, Electrotemp all title to the Protected Information, and for the purpose of applying for, prosecuting and obtaining registrations for any and all patents or any and all other intellectual property in respect thereof. Primo further hereby undertakes and agrees, to co-operate in every way possible in the prosecution of any such applications and not to oppose any such prosecutions, and Primo hereby acknowledges that this agreement to co-operate and waiver in the prosecution of any such applications shall continue notwithstanding the expiration and/or termination of this agreement.

(4)     Primo does hereby waive any moral rights, which Primo may have with respect to the Protected Information.

(5)     Primo agrees to execute any instruments and to do all other things reasonably requested by Electrotemp (both during and after the term of this agreement) in order to vest more fully in Electrotemp all ownership rights in the Protected Information.

## 16. Non-Solicitation

(1)     Primo covenants and agrees that during the term of this agreement and for a period ending THREE (3) years after the termination of this agreement, Primo shall not, directly hire or engage or attempt to hire or engage any individual who shall have been an employee of Electrotemp at any time during the term of this agreement, whether for or on behalf of Primo or for any entity in which Primo shall have a direct interest, or any subsidiary of affiliate of any entity, whether as a proprietor, partner, co-venturer, financier, investor or stockholder, director, officer, employer, employee, servant, agent, representative or otherwise.

(2)     Primo agrees with and for the benefit of Electrotemp that for a period of THREE (3) years from the date of the termination of this agreement, however caused, Primo will not for any reason, directly , either as an individual or as a partner or joint venturer or as an employee, principal, consultant, agent, shareholder, officer, director or sales representative for any person, firm, association, organization, syndicate, company or corporation, or in any other manner, solicit or accept business for the Products from any of Electrotemp's clients and customers wherever situated; and

(3)     Primo agrees with and for the benefit of Electrotemp that for a period of THREE (3) years from the date of the termination of this agreement, however caused, Primo will not for any reason, directly, either as an individual or as a partner or joint venturer or as an employee, principal, consultant, agent, shareholder, officer, director or sales representative for any person, firm, association, organization, syndicate, company or corporation, or in any other manner, solicit or accept

- 13 -

business for the Products from any of Electrotemp's suppliers to manufacture products that utilize the know-how, technology and knowledge disclosed by Electrotemp.

## 17. Application

Both Parties understand:

(1) that the provisions of paragraphs 2, 3, 15 and 16 of this agreement are of the essence of this agreement and constitute a material inducement to enter into this agreement to manufacture and sell the Products; and that both parties would not have entered into this agreement without such inducement.

(2) that all of the provisions of paragraphs 2, , 15 and 16 shall be construed independently of any other provision of this agreement, and the existence of any claim or cause of action by either party, whether predicated on this agreement or otherwise, shall not constitute a defence to the enforcement by the parties of any of the provisions of these paragraphs.

(3) Notwithstanding any other provision of this Agreement, paragraphs 2, 3, 15 and 16 shall survive the expiration or termination of this Agreement, however caused, including any renewal thereof.

## 18. Indemnity

(1) Electrotemp agrees to indemnify and hold Primo harmless against all actions, suits, claims, demands, proceedings and inquiries by reason, or arising out of or relating to any grossly negligent manufacture of the Products.

(2) Electrotemp's indemnification obligation shall not apply to the extent that such claims are caused or alleged to be caused by the joint, concurrent and/or sole negligence of Primo, any personnel employed or otherwise engaged by Primo to perform Primo's obligations and duties under this agreement.

(3) Primo agrees to indemnify and hold Electrotemp harmless against all actions, suits, claims, demands, proceedings and inquiries by reason, or arising out of or relating to any acts, duties or obligations or omissions of Primo or of any personnel employed or otherwise engaged by Primo to perform Primo's obligations and duties under this agreement.

(4) The parties agree to promptly notify the other of the service of process or the receipt of actual notice of any claim.

## 19. Dispute Resolution

(1) In the case of any dispute arising between Primo and Electrotemp as to their respective rights and obligations under this agreement, either party shall be entitled to

- 14 -

give to the other notice of such dispute and to request arbitration thereof and the parties may, with respect to the particular matters then in dispute, agree to submit the case to arbitration in accordance with the arbitration laws of Toronto, Canada and the parties agree that all proceedings and all documents required shall be in the English language.

(a) If a dispute arises out of or relates to this contract, or the breach thereof, and if said dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation under the Mediation Rules of the ADR Chambers International, to be conducted in the City of Toronto, Ontario, Canada, before resorting to arbitration.

(b) Any dispute arising out of or relating to this contract, or the breach thereof, that cannot be resolved by mediation within 30 days shall be finally resolved by arbitration administered by the ADR Chambers International under its International Arbitration Rules (or any successor rules thereto) (the "Rules"), and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The arbitration will be conducted in the English language in the City of Toronto, Ontario, Canada, in accordance with the Ontario International Commercial Arbitration Act R.S.O. 1990, c I.9 or any successor statute thereto

There shall be three arbitrators, named in accordance with such Rules provided, however, that to the extent it is not contrary to the Rules or applicable law, Electrotemp will provide a list of 10 arbitrators from which all three of the arbitrators are to be selected. Notwithstanding anything in this agreement to the contrary, this agreement and all disputes arising out of related to this agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein, without regard to the conflict of laws provisions thereof.

    (2)    Arbitration proceedings shall not take place until after total performance of the work except in a case where either party can show that the matter in dispute is of such a nature as to require immediate consideration while evidence is available.

    (3)    In the event that no provision or agreement is made for arbitration then either party shall have the right to seek recourse in such judicial tribunal as the circumstances may require.

## 20. Assignment

Neither this agreement nor any of the rights or duties of the parties shall be assigned, transferred or conveyed by the parties, by operation of law or otherwise, nor shall this agreement or any rights of the parties enure to the benefit of any trustee in bankruptcy, receiver, creditor, trustee or successor of the parties' business or of its property, whether by operation of law or otherwise, or to a purchaser of all of the shares of the parties or to a purchaser of the entire business or substantially all of the assets of the parties, without the prior written consent of the parties.

## 21. Amendments

- 85 -

This agreement shall not be modified, amended, altered, or supplemented in whole or in part without the prior written agreement of the parties.

## 22. Notice

Any notices, consents, approvals, statements, authorizations, documents, or other communications (collectively "notices") required or permitted to be given hereunder shall be in writing, and shall be delivered personally or mailed by registered mail, postage prepaid, to the parties at their respective addresses set forth hereunder, namely:

To the Electrotemp at: Yan Shan He Bei Lu No 9
Beilun District
Ningbo City, Zhejiang 315800
China

To the Primo at: 104 Cambridge Plaza Drive
Winston-Salem, NC, USA 27104

or at any such other address or addresses as may be given by any of them to the other in writing from time to time. Such notices, if mailed, shall be deemed to have been given on the second business day (except Saturdays and Sundays) following such mailing, or, if delivered personally, shall be deemed to have been given on the day of delivery, if a business day, or if not a business day, on the business day next following the day of delivery; provided that if such notice shall have been mailed and if regular mail service shall be interrupted by strike or other irregularity before the deemed receipt of such notice as aforesaid, then such notice shall not be effective unless delivered.

## 23. Trade Terms

Trade terms shall where appropriate, and where not inconsistent with the provisions of this Agreement, be interpreted in accordance with the current International Rules for the Interpretation of Trade Terms of the International Chamber of Commerce ("Incoterms") in force on the date of this Agreement.

## 24. Currency

Unless otherwise specifically provided in this agreement, all references to dollar amounts or other money amount are expressed in terms of lawful money of US Dollars.

## 25. Further Assurances

Each of the parties covenants and agrees that it, its heirs, executors, administrators, successors and permitted assigns will execute such further documents and do and perform or cause to be done and performed such further and other acts as may be necessary or desirable from time to time in order to give full effect to the provisions of this agreement.

- 16 -

26. Time of the essence

Time shall be of the essence of this agreement and of each and every part hereof.

26. Entire Agreement

This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous agreements, understandings and discussions, whether oral or written, and there are no other warranties, agreements or representations between the parties except as expressly set forth herein.

IN WITNESS WHEREOF we have set our hands and seals.

SIGNED, SEALED AND DELIVERED
    in the presence of:

ELECTROTEME TECHNOLOGIES CHINA        PRIMO PRODUCTS, LLC
Per:                                                          Per:

Name: _George M. Yui_____ c/s          Name: _____ c/s
Position: _President_____                      Position: _____
I have authority to bind the corporation.          I have authority to bind the corporation.

- 17 -

## Schedule "A"
## Products



| #000129 #000137 | #000133 #000161 | #000130 | #000142 | #000143 #000144 | #000140 | #000162 |

| #000170 | #000172 | #000173 | #000178 | RFQ#10-001A | RFQ#10-001B |

- 18 -

Schedule "A"
(Continued)
Products



RFQ#10-025        RFQ#10-026        RFQ#10-027

-19-

RFQ#10-028               RFQ#10-029

RFQ
Schedule "B"
Request For Quote

Attached as a separate Document

-29-